08 CV 03393

166-08/PJG
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)

RECEIVED
APR 07 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ELITE SHIPPING LIMITED,

                Plaintiff,

   -against-

BELARUSIAN SHIPPING CO.,

                Defendant.

-----------------------------------------------------------x

08 Civ.

**VERIFIED COMPLAINT**

      Plaintiff ELITE SHIPPING LIMITED (hereinafter "ELITE"), for its Verified Complaint against Defendant BELARUSIAN SHIPPING CO. (hereinafter "BELARUSIAN") alleges upon information and belief as follows:

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff ELITE was and still is a business entity duly organized and existing under the laws of a foreign country with an address and place of business at 171 Old Bakery Street, Valletta, Malta.

3.    At all times relevant hereto, Defendant BELARUSIAN was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at Office 408, 3 V. Khoruzhey Street, Minsk 220005 Belarus.

4.    On or about June 14, 2007, Plaintiff ELITE, in the capacity as owner of the M/S JULLIETA, entered into a maritime contract of charter party with Defendant BELARUSIAN for a time charter trip of two laden legs, the first of which was from Nikolayev to Paranagua carrying muriate of potash and the second of which was from Paranagua to Damietta carrying bulk sugar. A copy of the NYPE charter party dated June 14, 2007 is attached as Exhibit A.

5.    On June 22, 2007 the vessel was delivered to Defendant BELARUSIAN, the legs of the voyage were performed and the vessel was redelivered to Plaintiff ELITE by Defendant BELARUSIAN on September 7, 2007.

6.    The Defendant BELARUSIAN has performed as required under the charter party.

7.    Following the redelivery of the vessel, Plaintiff ELITE submitted their final hire statement to Defendant BELARUSIAN showing a balance due in Plaintiff ELITE's favor in the amount of $79,131.58. A copy of Plaintiff ELITE's hire statement is attached as Exhibit B.

8.    In breach of the terms of the charter party, and despite due demand, Defendant BELARUSIAN has refused or otherwise failed to pay the amount due and outstanding and the amount of $79,131.58 remains due and owing.

9. The charter party provides for the application of English Law and any dispute arising thereunder is to be referred to arbitration at London, and ELITE specifically reserves its right to arbitrate the substantive matters at issue.

10. This action is brought to obtain security in favor of Plaintiff ELITE in respect to its claims against Defendant and in aid of the London Arbitration proceedings.

11. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

12. This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

13. Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be $30,000, and interest on its damages are estimated to be $14,243.67 (calculated at the rate of 6% for a period of 3 years, the estimated time for completion of the proceedings in London) including any appeal of any arbitration award issued. Further, and to the extent further breaches may occur when additional hire becomes due, Plaintiff reserves the right to amend the Complaint and seek additional security in respect to any further breaches.

### Request for Rule B Relief

14. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly

have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name and/or in the name of its paying and/or funding agents TRASER ALLIANCE LTD., FORSBURG & CO., LLP, DEKKER LIMITED and MALTO LTD., at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

15.     The total amount to be attached pursuant to the calculations set forth above is $123,375.25.

WHEREFORE, Plaintiff ELITE SHIPPING LIMITED prays:

a.     That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.     That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $123,375.25 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendants (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its own name or as may be held, received or transferred for its benefit, and/or in the name of its paying agent and/or funding agents TRASER ALLIANCE LTD., FORSBURG & CO.,

LLP, DEKKER LIMITED and MALTO LTD., at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

d.    For such other, further and different relief, as the Court may deem just and proper in the premises.

Dated: New York, New York
April 7, 2008

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
ELITE SHIPPING LIMITED

By: _____
Peter J. Gutowski (PG 2200)
80 Pine Street
New York, NY  10005
(212) 425-1900

## **ATTORNEY VERIFICATION**

State of New York  )
        ) ss.:
County of New York )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.  I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.  The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.  The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

             _____
               Peter J. Gutowski

Sworn to before me this
7th day of April, 2008

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified In Queens County
Certified In New York County
Commission Expires Dec. 31, 2010

Ex. A

**ZEN & STEMOCO AS**
SHIPBROKERS

OSLO, NORWAY

# ORIGINAL

# Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 **This Charter Party**, made and concluded in *Oslo*, on the 14th ..................................................... day of *June, 2007.* ........................ 19 .....

2 Between *Elite Shipping Limited, 171, Old Bakery Street, Valletta, Malta,* ...........................................................................................

3 Owners of the good *Malta flag* ..................................... Steamship/Motorship *"JULLIETA" - see Clause 31 for vessel's description* of ....

4 of *20,511* ................. tons gross register, and *13,246* ................. tons net register, having engines of ......................................................... indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed at ..................................................................................

6 at ............................................ of about *1,530,068* ............... cubic feet *grain* bale capacity, and about *34,698 metric* .......................... tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of *11.18 metres* feet ............................ inches on *salt water* Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about ................................................................................ tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about *13.0* .......... knots on a consumption of about *28.0 metric* tons *(laden)* of IFO plus 2.5 metric tons MDO - *specification as per Clause 31* best Welsh coal - best grade fuel oil - best grade Diesel oil,

11 now *trading* ..........................................................................................................................................................................

12 ......................... and *Belarusian Shipping Co.,* .................................................. Charterers of the City of *Minsk, Belarus.* ..........

13 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about *one time charter trip, two laden legs, first leg via Black Sea, Med. Sea with bulk harmless fertiliser (intention muriate of* .....

15 *potash) to Indian Ocean (intention), or with grains/grain products or other cargo in accordance with Owners' cargo exclusions not requiring CO2, vessel to sail always via safe port(s), safe berth(s), safe anchorage(s), in/out geographic rotation, always afloat, always within Institute Warranty Limits, duration about 75/80 days, without guarantee,* within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute anay waiver of Owners' obligation.*

18 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Odessa, Ukraine, any time day or night, Sundays*

19 *and holidays included.* ........................................................................................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

22 ready to receive *any permissible* cargo with clean-swept holds and *throughout the period of this Charter vessel to be (unless caused by Charterers' or their agents' fault)* tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, including petroleum or its products, in proper containers, excluding *cargoes listed in Clause 41.* ............................................................

25 ..............................................................................................................................................................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America ......................................................................................................................... and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32 *Trading exclusions: Trading always within Institute Warranty Limits, but excluding Cuba, Abkhazia, Albania, Algeria, Calcutta, Libya, Syria, Lebanon, Turkish occupied Cyprus, Canada, Denmark, Norway, Sweden, Finland, Australia, New*

34 *Zealand, ex CIS Pacific ports, Eritrea, ex Yugoslavia, Iran, Iraq, Cambodia, North Korea, Liberia, Angola incl. Cabinda, Mozambique, Massawa, Namibia, Djibouti, Mauritania, Nigeria, Yemen, Sudan, Sierra Leone, Somalia, Zaire, U.S.A., U.K., Eire, Germany, France, Belgium, Holland, Italy and all war like areas and all places and/or territories under United Nations' sanctions, either presently in force or in future imposed. Vessel not to trade directly between Taiwan and China nor to call at Japanese ports affected by "Gypsy Moths".*

*Should Owners agree to trade war risk areas then any extra and/or additional war risk insurance premium charged by Owners' underwriters (local brokers) by reason of vessel's trading under this Charter Party to be for Charterers' account and to be refunded to Owners by Charterers upon receipt of copies of Owners' underwriters'/brokers' net invoices, such additional and/or extra insurance not to exceed that obtainable from The Hellenic Mutual War Risk Association on same terms and conditions as Owners cover. Any blocking/trapping/detention insurance to be for Charterers' account. Any crew war bonuses in accordance with crew contract of employment and/or P&I war risk areas payable by reason of vessel's trading under this Charter Party to be refunded to Owners by Charterers against documentation. All ice-blocked areas to be excluded. Vessel not to force ice nor to follow ice-breakers during the currency of present Charter Party. Vessel not to trade Lakes, not above San Lorenzo in Parana River, not above Munguba in Amazon River, not above Matanzas in Orinoco.*

35 as the Charterers or their Agents shall direct, on the following conditions:

36    1.   That the Owners shall provide and pay for all provisions, *fresh water including all Officers and crew overtime,* wages and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *and lubricating oil* and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service *with all inspection certificates necessary to comply with all current requirements at all ports of call and during the service.*

39 2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, *tolls, canal dues, wharfages, cranesmen, shore cranemen,* Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except *lubricating oil* those before stated, but when the vessel puts into

41 a port for causes for which *Owners are* vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43 charter to be for Charterers account, *including loding expenses should port authorities order crew ashore for safety reasons.* All other

fumigations to be for Charterers account after vessel has been on charter for a continuous period

of six months or more.

44 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

45 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

46 for dunnage, they making good any damage thereto.

47 3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

48 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than.....................................................tons and not more than

49 .................................tons and to be re-delivered with not less than........................................tons and not more than....................................tons. *See Clause 30.*

50

51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 33,000 (United States Dollars thirty-three*

52 *thousand) per day including overtime payable 15 days in advance,* United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

53 stores, on........................................................................summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a month *day;* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port Singapore/Japan range, including*

56 *full Malaysia, Indonesia range, any time day or night, Sundays and holidays included,* unless otherwise mutually agreed. Charterers are to

give Owners not less than *15 days' approximate*

57 notice of vessels expected date of re-delivery, and *7 days' approximate notice and 5/4/3/2/1 days' definite notice of date.* probable port. *Charterers to keep Owners advised of vessel's movements and notify Owners immediately of unforeseen delays.*

58 5. Payment of said hire to be made in New York in cash in United States Currency, semi-monthly *15 days* in advance, and for the last half month only

59 part of same the approximate amount of hire *(but always subject to the wording of Clause 29),* and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day

63 following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they

64 to have the privilege of using vessel at once, such time used to count as hire.

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70 lie aground. *NAABSA in East Coast South America only.*

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers

74 paying Owners........................................per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses are

75 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 ¡gency; and Charterers are to load, stow, *lash, unlash, tally, trim, discharge, dunnage and secure* and trim the cargo at their expense under the

supervision of the Captain, who is to sign Bills of Lading for

79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts, *unless Charterers are making use of their authority to sign as per Clause 49.*

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P&I Club boarding Letter of Indemnity,* and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the

84 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers *to pay the Owners a lumpsum of USD 1,250.00 per 30 days or pro rata for cable/victualling/ entertaining.* paying at current rate per meal, for all such victualling.

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a *legible* true copy of daily *deck and engine logs in English language* Logs, showing *among others* the course of the vessel and distance run and the con-

89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91 13. That the Charterers shall have the option of continuing this charter for a further period of ....................................................................................................

92 ....................................................................................................................................................................................................................................

93 on giving written notice thereof to the Owners or their Agents................................days previous to the expiration of the first-named term, or any declared option.

94   14.   That if required by Charterers, time not to commence before *18th June, 2006*.......................................................................... and should vessel
95   not have given written notice of readiness on or before *25th June, 2006*,................................................. but not later than *24:00 hours* ~~4 p.m.~~ Charterers or
96   their Agents to have the option of cancelling this Charter at any time not later than the *hours* ~~day~~ of vessel's readiness.

97   15.   That in the event of the loss of time from deficiency *and/or default* of men or *deficiency of* stores, fire, breakdown or damages to hull,
     machinery or equipment,
98   grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99   preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated. Any proven stevedore and/or labour
     charges for breakdown of vessel's equipment not caused by Charterers to be for Owners' account.*

102  16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  17.   That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~New York~~ *London*,
108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be ~~commercial~~ men *conversant with shipping
     matters and affairs. See also Clause 84.*

110  18.   That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113  might have priority over the title and interest of the owners in the vessel.

114  19.   That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115  Crew's proportion. General Average to be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116  York-Antwerp Rules *1994 or any subsequent amendments.* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to
117  matters not provided for by these~~
     ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~
126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~
132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *It is understood that the
     Charter hire is not to contribute to General Average.*

133  20.   Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.

135  21.   ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138  *Vessel not to be dry-docked whilst performing this Charter except in case of emergency.* ................................................................
139  ...................................
140  22.   Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts *as specified in Clause 31. Owners
     also to provide on the vessel sufficient light clusters as on board for night work at all hatches simultaneously free of charge to
     Charterers and are to maintain same in efficient working condition throughout this Charter.* ~~up to three tons, also~~
141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144  Charterers to have the use of any gear on board the vessel, *Sundays and holidays included.*

145  23.   Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port, or labor unions, prevent crew from driving winches,~~ shore Winchmen to be paid by Charterers. In the event of a disabled *crane or cranes* ~~winch or
     winches, or~~
149  insufficient power to operate ~~winches~~ *cranes*, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby.

151  24.   It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153  etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:
155  U. S. A. Clause Paramount
156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160 ~~Both to Blame Collision Clause~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167 25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170 26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, and all other matters, *except for Time Charterers' responsibility as agreed in this Charter and rider,*
. same as when trading for their own account.
172 27.  A commission of ~~2 1/2~~ *1.25* per cent is payable by the Vessel and Owners to *Lorentzen & Stemoco AS, Oslo*
173 ..........................................................................................................................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28.  An address commission of 2 1/2 per cent payable to *Charterers* ........................................................ on the hire earned and paid under this Charter.

*Rider Clauses Nos. 29 to 101, all inclusive, as attached, are to be fully incorporated in this Charter Party.*

*THE OWNERS:*                                          *THE CHARTERERS:*



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

**ADDITIONAL CLAUSES TO M/V "JULLIETA"**
**CHARTER PARTY DATED JUNE 14, 2007**

**Clause 29 - Hire Payment Clause**

A)    First hire and value of bunkers on delivery to be paid within three (3) banking days after vessel's delivery with Owners invoice. Charterers are entitled to deduct Owners' expenses (but max. USD 500 per port) as well as estimated value of bunkers on redelivery from last sufficient hire payment. No deduction for vessel's disbursements accounts is allowed. Owners will arrange settlement of same directly with Agents or Master will pay them in cash. If vessel delayed due to Owners' delay and/or failure in arranging Owners, Master and/or fund whatsoever, any extra time/cost which may occur therefrom shall be for Owners' account.

B)    Where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of Charterers' employees, bankers or agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners three (3) banking days written notice to rectify the failure and where so rectified the payment shall stand as "punctual and regular payment". If there is a failure of the bank, Charterers to have two (2) working days grace to rectify the failure.

C)    In the event that the vessel is expected to be redelivered to the Owners prior to the expiry of the last 15 days period that would be covered by the next payment of hire. Charterers shall be entitled to effect payment of hire on the basis of the estimated time necessary to complete the service.

D)    Owners will put agents in funds for cash to Master, provisions, supplies, etc.

E)    Charterers have the right to withhold from the Charter hire during the period of this Charter such reasonable amounts due them for off-hire time (provided agreed between Owners and Charterers).

Notwithstanding anything contained herein to the contrary it is understood that if at any time during the currency of this Charter the hire payment shall become due on a Saturday, Sunday or holiday or outside normal banking hours, payment of hire may be made on the next banking day immediately following the date on which hire became due and such payment shall stand as "punctual and regular payment".

F)    Bank for hire payment:
     The Royal Bank of Scotland, 45,
     Akti Miaouli Str., 185 10 Piraeus, Greece
     SWIFT: RBOSGRAA
     Correspondent Bank: JP Morgan Chase Bank,
     New York, NY
     SWIFT: CHASUS33
     In Favour of: Elite Shipping Limited
     Account No.: 194.973-100
     IBAN No.: GR09 0640 0010 0000 0019 4973 100

**Clause 30**
Vessel to be delivered with bunkers as on board about 550/620 metric tons of IFO and about 140/170 metric tons of MDO, and vessel to be redelivered with same quantities as on delivery.

Same prices both ends: USD 330.00 per metric ton for IFO and USD 620.00 per metric ton for MDO.

Value of bunkers on delivery payable together with first hire payment, and same may be deducted only from last sufficient hire payment. Eventual minor differences on quantities to be settled along with final hire statement.

Owners' option to bunker for their own account prior to redelivery provided same does not interfere with Charterers ' operations. Charterers' option to bunker for their own account prior to delivery into this Charter Party provided same does not interfere with present Charterers'/Owners' operations.

**Clause 31 - Vessel's Description**
M/V "JULLIETA"
Single deck - Bulk carrier - Built Nov. 1983
DWAT 34,698 mts on 11.18 m SSW - Malta flag
GRT/NRT 20511/13246 - grain/bale 1530068/1440301 cbft
LOA/Beam 197/24.20 m - Cranes 4 x 25 mts each
5 holds/hatches - MacGregor hatch covers, single pull chain driven
Hatch dims.: 1) 13.26 - 2/3/4/5) 19.07 all by 13.46 m
Class: BV - P&I Club: West of England - Call Sign: 9HUT6
Depth moulded 15.20 m
Speed/consumption: Abt. 13.5 knots ballast/13 knots laden on 28 mt IFO and 2.5 mt MDO at sea or 2 mt at port/idle
IFO spec. 180 CST RME 25 ISO 8217/96 CCAI not above 800 / MDO DMB
In compliance with regulations 14 & 18 of Marpol Annex VI incl. SECA areas
WWW basis   8 hours plus 1.5 mt MDO = 3.5 mt
WWW basis 16 hours plus 1.1 mt MDO = 4.6 mt
WWW basis 24 hours plus 0.8 mt MDO = 5.4 mt
Vessel uses MDO when manoeuvring in narrow/shallow waters
Strengths: Tank top 22 mt/m2 - main deck 3.00 mt/m2 - hatch cover 1.75mt/m2
TPC/TPI 41.25/104.77 - FWA 25.80 mts
Speed/consumption given basis good weather, winds not exceeding 4 of Beaufort Scale, sea state not exceeding No.3 of Douglas Scale and no adverse current

All details "about" and without guarantee.

H+M Value: USD 14,000,000

Owners' style: Elite Shipping Limited, 171, Old Bakery Street, Valletta, Malta

Managers' full style/address:
Corner Shipping Co Ltd
1, Vas. Petrou Servias & Papanastasiou Ave.,
185 33 Kastella/Piraeus/Greece

LORENTZEN & STEMOCO AS

3

Tel: 0030-210-4130300
Fax: 0030-210-4130924 Tlx:211357 Corn Gr
Internet Address: www.Corner-Shipping.Gr
E-Mail: Info@Corner-Shipping.Gr
MIC: Cpt. Stavros Kavallaris
Mob: 0030-6944-607763
AOH: 0030-27410-68691

Vessel's contact details:
Tel: 00870-763709222 Capt. Office
Tel: 00870-763709225 Bridge
Fax: 00870-763709223
Tlx: 424887810/811
E-Mail: Master.Mv_Jullieta@Telaurus.Net
Masters' name: Nicolae Badiu

Owners guarantee that the vessel will comply with IMO Regulations and
Requirements.

Owners confirm all certificates valid and up-to-date.

### Clause 32
Basic annual War Risk Insurance for worldwide trading to be for Owners' account. In
the event that Charterers employ the vessel in a trade for which there is an additional
war risk premium, Charterers to pay for such additional premium actually paid by
Owners including crew war bonus. Owners to send original invoice supported by
Underwriters' debit note as vouchers.

### Clause 33
Charterers to have the benefit of any return insurance premium receivable by
Owners from their Underwriters, as and when received from Underwriters, by reason
of the vessel being in port for a minimum period of 30 days if on full hire for this
period and pro rata for the time actually on hire.

### Clause 34
Owners and Charterers jointly to appoint one independent surveyor acceptable to
both parties to carry out joint survey to determine bunkers remaining on board and
hold condition. On-hire survey to be held in Owners' time at first load port and off-hire
to be held in Charterers' time at last discharge port before redelivery, but only time
lost to be deducted from hire. Expenses for on-/off-hire surveys to be equally shared
between Owners and Charterers.

### Clause 35
Both parties to have the option of cancelling this Charter Party with reasonable notice
provided vessel is free of cargo if war breaks out between any two or more of the
following countries to such an extent as to render the continuation of the Charter
Party impossible:

U.S.A., Great Britain, Japan, The People's Republic of China, France, Republic of
Korea, Greece, North Korea, Cyprus and Turkey.

LORENTZEN & STEMOCO AS                                                    4

**Clause 36**
Should the vessel put back whilst on voyage by reason of any accident or breakdown or deviation upon the course of the voyage caused by sickness or any accidents to the crew or any person on board the vessel, other than persons travelling at the request of the Charterers, or by reason of the refusal of the Captain or crew to perform their duties, the hire shall be suspended from the time of putting back until she be again in the same position or equivalent or regains the line of voyage whichever is the shorter distance and voyage resumed therefrom.

Bunker consumed during the aforementioned period shall be for Owners' account. Especially the following events to be deemed as off-hire until the vessel be again in the same or equivalent position and resumed the voyage:

a)      In the event of deviation from landing invalid crew and/or stowaway.
b)      In the event of loss of time from strike of the crew.
c)      In the event of deviation by alleged oil pollution.

**Clause 37**
Charterers shall not in any event be liable for claims in connection with stevedore damages suffered by the vessel and/or equipment unless:

A)      Master advises Charterers or their agents in writing or by cable within 24 hours of occurrence of any damage for which Master considers Charterers liable so that Charterers may claim against stevedores or parties responsible. In case of hidden damage same to be reported as soon as discovered, but always prior to redelivery.

B)      Such damage shall have been entered in vessel's log books when discovered and

C)      Master shall also have held stevedore or parties responsible for damage liable in writing or by cable with copy to Charterers.

If extent of damage can not be ascertained on occurrence, Owners/Master must report occurrence of damage in accordance with (A), (B) and (C) as above and details may follow when examination possible. If at time of redelivery there remains outstanding damage for which Charterers may be liable but which, without affecting the seaworthiness of the vessel, can be repaired by Owners at any convenient time after redelivery, Owners undertake to accept redelivery under Clause 4 of this Charter Party.

If redelivery is accepted as above, Charterers undertake to reimburse Owners cost of repairs as ascertained later by mutually agreed surveyor when repairs carried out and liabilities settled.

Any stevedores damage affecting seaworthiness and/or trading capability of the vessel and/or vessel's class to be repaired by Charterers prior to vessel's leaving port and time of repairs to count.

**Clause 38**
Vessel to be delivered with valid deratisation or deratisation exemption certificate on board and if this does not cover the whole period the Time Charter and deratisation is necessary, cost of same and detention to be for Owners' account, except as provided for in Clause 2. Fumigation if required on account of cargo carried to be for Charterers' account (cost and time).

**Clause 39**
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo. Owners and Master also undertake to co-operate with Charterers in taking necessary steps for cargo fumigation, if necessary, at Charterers' time and account.

**Clause 40**
Vessel to possess the necessary certificates to comply with safety and health regulations and current requirements at all ports of call.

**Clause 41 - Cargo Exclusions**
Following cargoes are excluded from trading:
Passengers, live stock, tobacco, fishmeal, bones, mobile and prefabricated homes/ buildings, asbestos, pitch, tar, asphalt in bulk, vegetables and fruit, creosoted goods, sponge iron, iron briquettes, hot briquette iron, hides, arms, ammunition, explosives, clays in bulk, ferrosilicon, zinc and zinc concentrates, lead concentrates, silicon chrome, silicon manganese allowed for grades not requiring app., manganese ore, iron ore (ex Brazil), dangerous/hazardous/injurious and inflammable goods/cargoes (but see below), turnings, DRI, HBI, sunflower seed expellers, raw cotton, raw copra, palm kernel expellers, charcoal, quebracho extract, salt cake, nuclear and radioactive products and waste, acids (asphalt/pitch/tar) in drums, dynamite, calcium carbide, inflammable goods, Indian coal or hot coal with temperatures above transportable limits, nitrate of ammonia, Chilean nitrates, petroleum or its products incl. green delayed petcoke and calcinated petcoke, coal, wet hides, black powder, blasting caps, resin, manioc, calcium hydrochlorite otherwise known as calcium oxychoride, borax, seed cakes, oil cakes, naphtha, caustic soda, ash, logs, salt, cement, clinker, mineral sand, sulphur, titanium slag, alumina, scrap, motor blocks and turnings and all sort of steel/steel products.

Concentrates, if carried, to be in full conformity with and to be in accordance with IMO Regulations/Recommendations and local authorities and certificate of water contents to be within safety margin for water transport. Charterers to arrange any cargo carried to be loaded/discharged in accordance with IMO Regulations and Requirements, notwithstanding any other provisions. It is agreed that nuclear fuel or radio active products or waste are specifically excluded from this Charter Party. Also all fertilizers which are over and above normal harmless fertilizers such as technical urea or any other fine grade requiring special cleaning of vessel's holds. No deck cargo allowed during the currency of present Charter Party. Owners not to be responsible for cargoes loaded in the same hold for any contamination and/or damage to cargo which may arise due to mixed bulk.

**Clause 42**

LORENTZEN & STEMOCO AS

6

Charterers to have the option of holding a superficial inspection at any time, Owners or Mater giving every facility to carry it out.

**Clause 43**
Owners undertake that the vessel will be furnished with a certificate of evidence of financial responsibility as may be required under the United States Water Quality Improvement Act of 1970 and any amendments thereto.

**Clause 44 -  BIMCO Standard War Risks Clause for Time Charters,**
**1993 Code Name: "CONWARTIME 1993"**
(1)     For the purpose of this Clause, the words :
(a)  "Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, Managers or other Operators who are charged with the management of the Vessel, and the Master, and

(b)  "War Risks" shall include any war (whether actual or threatened), act of war, Civil War, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2)     The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)     The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)     (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls

shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5)     If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)     The Vessel shall have liberty:-
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolutions of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)     If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request the Owners may discharge the cargo at any safe port of their own choice.

(8)     If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**Clause 45**
On delivery all cargo holds to be completely clean/swept/washed down by fresh water and dried up and fully ready to receive Charterers' intended cargo in all respects, free of salt, rust scale and previous cargo residue and should pass shipper's or competent

authorities' inspection. Otherwise vessel to be put off-hire from the time of failing until the time of passing re-inspection and any time lost/expenses incurred thereby to be for Owners' account.

Charterers have the option to redeliver the vessel without cleaning holds paying USD 4,500.00 lumpsum including all dunnage, lashing, debris removal/disposal.

The Charterers shall provide and pay for cleaning of holds between the voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by local regulations at a rate of USD 600.00 per hold actually cleaned.

In connection with such operation the Owners shall not be responsible if vessel's holds are not accepted or passed by the port or any other authority and vessel to remain on-hire.

**Clause 46**
Owners to advise Charterers full name of Master when fixture is confirmed and Owners to give advance notice to Charterers with full name of new Master when Owners decide to change Master.

**Clause 47**
Charterers to undertake to keep Owners and Master informed during the periods of the itinerary of the vessel and the name of their agents at ports of call.

**Clause 48**
Charterers' agents to attend to vessel's normal requirements such as delivery/sending crew mail, sending/receiving or delivering telexes/telephone message to or from the vessel, arranging crew transportation to dock etc., without charging agency fee but actual cost for any services performed to be for Owners' account, agency fee for major repairs etc. to be negotiated between Owners and Charterers' agents directly.

**Clause 49**
Charterers' Bill(s) of Lading to be used and the Master to release to Charterers or their agents his authority to sign Bill(s) of Lading on his behalf, provided in accordance with Mate's receipts. No through Bill(s) of Lading to be issued under this Charter Party.

Also no Liner Bill(s) of Lading to be issued/used under this Charter Party.

**Clause 50**
If the vessel calls at any U.S. port for the purpose of loading or discharging cargoes, vessel's cargo gear and all other equipment shall comply with the regulations established by U.S. Public Law 85, 742, Part 9 (Safety and Health Regulations for Longshoring).

**Clause 51**
Opening and closing of hatches to be always done by crew members free of expense to Charterers, if permitted by local regulations.

LORENTZEN & STEMOCO AS                                                    9

**Clause 52**
Owners/Master to give Charterers delivery notice up-dated expected delivery time on fixing 7/5/3/2 days' and 24 hours prior to date of delivery.

**Clause 53**
Owners' P&I Club:   The West of England.
Charterers have the benefit of Owners' P&I Club so far as the rules permit.

Notwithstanding anything that may be contained in this Charter Party to the contrary, it is expressly agreed that the Owners shall remain responsible for and indemnify the Charterers against all claims arising in connection with loss of life, personal injury or similar claims on board the vessel whilst on hire, if caused by vessel's deficiency. If caused by Charterers then it is their responsibility.

**Clause 54**
Throughout the period of this Charter vessel will have on board current valid and up-to-date Suez Canal Admeasurement Certificate and will so comply with all applicable requirements, regulations and recommendations of the Canal authority so as to avoid any delay in transit of the Suez Canal.

Any delay caused by non-compliance with the aforesaid or lack of proper documentation and/or certificates and/or equipment and fittings required to transit the Suez Canal will be considered off-hire and all expenses resulting from such delay, including bunkers consumed during that period will be for Owners' account.

**Clause 55**
If the vessel is off-hire for a consecutive period of 30 days, Charterers have the right to cancel this Charter Party without any further obligations under this contract on the part of Charterers, provided no cargo remaining on board.

**Clause 56**
All taxes and/or dues on vessel, cargo, freight and/or charter hire to be for Charterers' account, however, taxes and/or dues levied on charter hire by vessel's country of registry and/or domicile to be for Owners' account.

**Clause 57**
In the event of breakdown of winches/cranes by reason of disablement unless caused by negligence of shore winch men or insufficient power or otherwise, the hire to be reduced pro rata for the period of such insufficiency in proportion to the number of cranes that were available at the time of breakdown of equipment.

If Charterers elect to continue work on hatch or hatches affected by breakdown by hiring shore appliances, Owners are to pay for shore appliances, but in such case Charterers are to pay full hire for all time shore appliances are working. Any stevedoring and/or labour charges additionally accruing due to breakdown of vessel's equipment, including costs of standby of stevedores' labour, to be for Owners' account.

**Clause 58**
Owners guarantee that the vessel is a craned equipped single deck bulk carrier with engine(s) and bridge located aft.

LORENTZEN & STEMOCO AS

**Clause 59**
In case of loss of time due to boycott, picket and/or labour shortage at any port or place by the shore and/or port labour and/or tugboat(s) and/or the pilots and/or governmental authority directly attributable to ownership and/or the terms and conditions on which members of the Officers/crew were employed, vessel then to be off-hire for any time lost thereby and the cost of bunkers consumed during the period to be for Owners' account.

**Clause 60**
Charterers' option to weld padeyes except on fuel tank tops and hoppers and at Master's reasonable satisfaction, at their own arrangement and expense and Charterers to remove all padeyes before redelivery at Master's reasonable satisfaction, but Charterers' option to redeliver the vessel without removing padeyes against paying USD 15.00 per padeye in lieu of removal.

**Clause 61**
Liabilities for cargo claims shall be borne by Owners/Time-Charterers in accordance with the Interclub New York Produce Exchange Agreement of February 1970 and reprints of 1996. The party having paid the claim shall submit to the other party supporting documents as soon as possible.

**Clause 62**
Owners warrant that the vessel is not engaged in Black Sea/Arab League countries area trading with ITF/WWF in good order. Owners further guarantee that the vessel is not black listed by any Arab League countries. Vessel is not black listed by US/Canadian Longshoremen's Union.

Owners guarantee that vessel is not black listed by trading countries due to vessel's flag/ ownership/operators/age and whatsoever.

**Clause 63**
Any delays, expenses and/or fines incurred on account of smuggling if caused by Master, Officers and/or crew to be for Owners' account.

**Clause 64**
Owners warrant that the vessel is eligible for bunkers in the United States of America and its territories.

**Clause 65**
Charterers and supercargo to have the right of using the vessel's means of communication at ruling tariff costs.

**Clause 66**
No crane men/winch men from crew.

**Clause 67**
Charterers to supply fresh water at Owners' account during this Charter, except the same used for Charterers' business which to be for Charterers' account.

**Clause 68**
Vessel uses marine gas oil in main engine when entering/leaving port and when manoeuvring in narrow/shallow/restricted waters.

**Clause 69**
Owners guarantee that they will act with due diligence so that vessel's hatch covers are to be watertight all throughout this Charter period and if any hatch cover found to be defective, same to be rectified at Owners' time and expense to independent surveyors' satisfaction. Charterers also have the right to carry out hose test on all hatches at any time during this Charter.

**Clause 70**
Cargo gear to be in fully efficient state throughout the currency of the Charter Party.

**Clause 71**
Owners warrant that all vessel's holds are clear of any fittings/superstructures such as car deck/curtain plates whatsoever.

**Clause 72**
Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, the hire shall be suspended for any period that the vessel remains under arrest or remains unemployed as the result of such arrest and Owners shall reimburse to Charterers any expenditure which they may incur under this Charter in respect of any period during which, by virtue of the operation of this Clause, the hire is suspended.

This Clause is inoperable should the arrest be caused by any or omission of Charterers or their agents.

**Clause 73**
Owners to allow Charterers to discharge the cargo without presentation of original Bill(s) of Lading against Charterers provide Letter of Indemnity as per Owners' P&I wording signed by Charterers only. Charterers and/or their agents have the option to sign Bill(s) of Lading on behalf of Master in accordance with Mate's or Tally Clerk's receipt without prejudice to this Charter Party.

**Clause 74**
Charterers to have the privilege at their risk and expense of using bulldozers with rubber tyres in vessel's holds within the vessel's tank top limitations. Any damage occasioned thereby to be for Charterers' account.

**Clause 75**
Vessel to have on board all necessary certificates of financial responsibility for oil pollution.

**Clause 76**
Deleted.

LORENTZEN & STEMOCO AS

12

**Clause 77**
The Owners shall also provide and pay for consular fees pertaining to vessel's nationality or flag and garbage removal (except hold sweeping) actually removed at Owners' expense, but if garbage fees are compulsorily incurred when not required, then same to be for Charterers' account.

**Clause 78**
Normal quarantine time and expense for the vessel entering port(s) to be for Charterers' account, but any time of detention and expense for quarantine due to pestilence, illness etc., of Master/Officers/crew to be for Owners' account.

**Clause 79**
Owners guarantee that the vessel is not to be boycotted by any ports/countries of call during Charter period under governing Charter Party by reason of vessel's crew/Officer employment terms and Owners fully responsible for all/any results/losses/damages/ expenses incurred therefrom due to crew employment.

**Clause 80**
In order to maximise vessel's performance, Master is to follow Ocean Routes or similar institutions suggestions concerning navigation, but Master at his reasonable discretion may not follow suggested route in which case he is to detail in the log book the reason for departing from them.

Should Master use his discretion unreasonably, the Charterers to have title for claiming the eventual under performance.

Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of Aerospace Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies the matter to be taken into further arbitration. In any case Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

> Aerospace & Marine International Corporation
> 6920 Santa Teresa Boulevard, Suite 209
> San Jose, CA 95119, USA
> Tel.: 408-360-0440 - Fax: 408-360-0450 - Tlx: 149158
> E-mail: ops@weather3000.com - Web: www.amiwx.com

**Clause 81**
Owners guarantee that valid ITF agreement or equivalent agreement for the vessel covering any port or place is available on board for the whole period of this Charter Party.

**Clause 82**
Master to cable "Belarusian Shipping Co. of Minsk" each second day stating vessel's position, speed and estimated time of arrival next port to be called at.

LORENTZEN & STEMOCO AS                                                          13

**Clause 83**
Watchmen charges, if any, shall be borne by party arranging or ordering same. If compulsory then same to be for Charterers' account.

**Clause 84 - Addition to Arbitration Clause**
This contract is governed by English Law and there shall apply to arbitration proceedings under this Clause the terms of the London Maritime Arbitrators' Association current at the time when arbitration proceedings are commenced.

All disputes arising under this Charter to be referred to arbitration in London. One arbitrator to be nominated by the Owners and the other by the Charterers. In case arbitrators can not agree to a decision they will appoint an umpire whose award will be final and binding upon both parties.

In accordance with the arbitration act of 1950 and subsequent amendments if either of the appointed arbitrators refuses to act, or is incapable of acting or dies the party who appointed him may appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, either originally or by way of substitution as aforesaid, for seven clear days after the other party, having appointed his arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an arbitrator may appoint that arbitrator to act as sole arbitrator in the reference and his award shall be binding on both parties as if he had been appointed by consent.

Notwithstanding anything to the contrary in this Charter, the parties agree that all arbitrations where the amount in issue in the dispute(s) is less than USD 50,000.00 shall be conducted according to the small claims procedure 1989 (SCP) of the London Maritime Arbitrators' Association (as amended from time to time).

If after commencement of such reference it appears on reasonable grounds that the sums in issue in any dispute or disputes exceed USD 50,000.00 either party shall be entitled to require in writing that the reference henceforth should proceed with regard to the SCP. Provided that there is no prior agreement (whether in this Charter Party or not) to refer disputes to a sole arbitrator; each party thereupon shall have seven days to appoint its arbitrators under the arbitration provisions set out elsewhere in this Charter with the SCP arbitrator sitting as umpire or third umpire.

**Clause 85**
This fixture to be kept totally private and confidential.

**Clause 86**
Owners confirm vessel has not traded C.I.S. Pacific ports in the last 4 (four) years.

**Clause 87**
Owners guarantee that the vessel is not to be rejected at any port of call during this Charter period by reason of trading with Cuba/Vietnam before and any time/expenses incurred thereby to be for Owners' account.

**Clause 88**
For the purpose of computing hire payments, the time for delivery/redelivery shall be adjusted to GMT.

**Clause 89**
In connection with lines 9/10 of the main bode "good weather" is taken to mean winds up to and including Beaufort Four (4) and in vessel's speed "about" shall mean plus/minus 5 per cent.

Evidence of wind and sea conditions to be taken from vessel's log and Ocean Routes.

**Clause 90 - BIMCO Standard ISM Clause**
During the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

**Clause 91**
Deleted.

**Clause 92**
Owners guarantee vessel can load up to full deadweight capacity provided stowage factor of cargo permits and provided no restrictions at loading and discharging ports.

**Clause 93 - BIMCO Standard Year 2000 Clause**
Deleted.

**Clause 94**
New Jason Clause, General Clause Paramount, New Both-to-Blame Collision Clause, P&I Bunker Clause and Chamber of Shipping Nuclear Clause as attached to be considered as part of this Charter Party. USA Clause Paramount is deemed to be inserted in all Bill(s) of Lading issued hereunder.

**Clause 95 - BIMCO Fuel Sulphur Content Clause of Time Charter Parties**
Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuel of such specifications and grades to permit the Vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the Vessel is trading within that zone. The Charterers shall indemnify, defend, and hold harmless the Owners in respect of any loss, liability, delay, fines, costs, or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency".

LORENTZEN & STEMOCO AS

15

**Clause 96 - Hamburg Rules**
Neither the Charterers nor their agents shall permit the issue of any Bill(s) of Lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-charterers) incorporating, where not compulsorily applicable the Hamburg Rules or any other legislation, giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague-Visby Rules. The Charterers shall indemnify the Owners against all liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

**Clause 97 - U.S. Trade - Unique Bill(s) of Lading Identifier Clause**
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4 Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to a breach of warranty for the consequences of which the Charterers shall be liable and shall hold Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

**Clause 98 - BIMCO ISPS/MTSA Clause for Time Charter Parties 2005**
(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the

LORENTZEN & STEMOCO AS

Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### Clause 99 - U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a)    If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and expense:

  i)    have in place a SCAC (Standard Carrier Alpha Code);
  ii)   have in place an ICB (International Carrier Bond);
  iii)  provide the Owners with a timely confirmation of i) and ii) above; and
  iv)   submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b)    The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c)    If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

LORENTZEN & STEMOCO AS

17

(d)    The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## Clause 100 - BIMCO Double Banking Clause

(A) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(B) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(C) Without prejudice to the generality of the Charterers' rights under (A) and (B), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe so to do.

(d) Th e Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

(e) Th e Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

(f)  In view of trans-shipment, and agreement under present Charter Party that no "Through" Bills of Lading to be issued/used Owners' liability on cargo shall cease upon completion of discharge to the other vessel.

## Clause 101 - Clause for Grain Loading / Certificates / S.C.I.A. / Grab Discharge / Calling Australia

Deleted.

LORENTZEN & STEMCO AS

18

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1950, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:-

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned and operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## CHAMBER OF SHIPPING NUCLEAR CLAUSE

Notwithstanding any other provision contained in this Charter, it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radioactive isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof.

## P&I BUNKERING CLAUSE

The vessel, in addition to all other liberties, shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following Clause shall apply:-

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## U.S.A.  CLAUSE PARAMOUNT

This Bill of Lading shall have the effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.

The provisions stated in said Act shall (except as maybe otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier. The Carrier shall not be liable in any capacity whatsoever nor any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier.

Ex. B

```
REF:MV JULLIETA  / ACC B.S.C. , CP DD 14/06/07
SUB:REVISED PFHS
=====================================================================

HIRE 22/06/07 06:30HRS GMT TILL 07/09/07 19:30HRS GMT
Days 77.54167DX$33,000            2,558,875.00
BONUS FOR REDELY DAMIETTA            50,000.00
LESS COMMISSION 3,75%                                    97,832.81


OFF HIRE FOR DELAY ON DELY
22/06(11:08)-22/06(18:30)
7HRS 22MIN        Days 0,3069444                         10,129.17
PLUS COMMISSION 3,75%                   379.84
CONSUM DURG OFF-HR DO mt 0,6138x$620.00                     380.61
C/V/E OFF-HR                                                 12.61


OFF HIRE HOLDS NOT ACCETED ZYZHNY
23/06(17:00)-24/06(08:00)
HRS 15           Days 0,625x$33,000                      20,625.00
PLUS COMMISSION 3,75%                   773.44
CONSUM DURG OFF-HR DO mt 1,25x$620.00                       775.00
C/V/E OFF-HR                                                 26.04


OFF HIRE DEFECT AT SHIP'S CRANE
IN PARANAGUA                                              1,861.98
PLUS COMMISSION 3,75%                    69.82
CONSUM DURG OFF-HR DO mt 0,11284x$620                        69.97
C/V/E/ OFF-HR                                                 2.32


TIME LOST PARANAGUA-DAMIETTA 9,1HRS                      12,043.28
MDO OVERCONSUMED 1MT X $705                                 705.00
IFO OVERCONSUMED 10.88MT X $320                           3,841.60


BUNKERS ON DELY
              FO mt 625.633 x 330.00   206,458.89
              DO mt 130.091 x 620.00    80,656.42
INTERMEDIATE HOLD CLEANIG (5HXUSD 600)   3,000.00
ILOHC                                    4,500.00
C/E/V 1250 PMPR : 30D X 77.5416D         3,186.64


BUNKERS ON REDL
(per bunker survey)FO mt 566.144 x 330.00                186,827.52
(estimated)        DO mt  66.760 x 620.00                 41,391.20

LESS AMOUNT RECEIVED
  1ST REMITTANCE                                        764,174.74
  2ND REMITTANCE                                        150,000.00
  3RD REMITTANCE                                        216,761.70
  4TH REMITTANCE                                        102,000.00
  5TH REMITTANCE                                         48,000.00
  6TH REMITTANCE                                        327,053.94
  7TH REMITTANCE                                         89,600.77
  8TH REMITTANCE                                        334,321.06
  9TH REMITTANCE                                        133,616.32
 10TH REMITTANCE                                         95,410.79
 11TH REMITTANCE                                        133,608.33
 12TH REMITTANCE                                         48,524.93
```

| | | |
|---|---|---|
| 13TH REMITTANCE | | 9,171.78 |
| | 2,907,900.05 | 2,828,768.47 |
| BALANCE DUE TO OWNERS | 79,131.58 | |